IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| DAVID DIETZEL, | ) | Civil No.: 3:11-cv-00357-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

Max Rae
P.O. Box 7790
Salem, OR 97303

      Attorney for Plaintiff


S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902


FINDINGS AND RECOMMENDATION - 1

L. Jamala Edwards
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff David Dietzel brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying his applications for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act).

For the reasons set out below, the Commissioner's decision should be affirmed.

## **Procedural Background**

Plaintiff filed his applications on July 28, 2005, alleging that he had been disabled since October 2, 2002. After the applications were denied initially and upon reconsideration, he timely requested a hearing before an Administrative Law Judge (ALJ). A hearing was held before ALJ Marilyn Mauer on December 22, 2008.

In a decision filed on March 11, 2009, ALJ Mauer found that Plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on February 15, 2011, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff seeks review of that decision.

**Factual Background**

Plaintiff was born on May 20, 1954.  He was 48 years old at the time of the alleged onset of disability in 2002, and was nearly 55 years old on the date of the ALJ's decision denying his applications.  Plaintiff has a high school education.  He worked for 23 years as a guide setter at a steel rolling mill, and has not worked since he had orbital decompression surgery on both eyes in 2002.

Plaintiff alleges that he is disabled because of Graves' disease with related vision problems, anxiety, depression, tinnitus, tendinitis, and back and foot pain.

**Medical Record**

Plaintiff has Graves' disease, which has caused a condition referred to in the record as "Graves' opthalmopathy."  Plaintiff began to experience ocular pain in the late 1990s and was subsequently diagnosed with thyroid eye disease and proptosis, lag ophthalmus, exposure keratitis and orbital pressure.  In October, 2002, orbital decompression surgery was performed on each eye.  Dr. U. John Berzins, an opthalmologist, treated Plaintiff following these surgeries. In chart notes dated November 25, 2002, Dr. Berzins stated that Plaintiff had obtained excellent results from surgery, with reduced proptosis and no obvious diplopia.  Dr. Berzins noted that Plaintiff continued to have some elevated pressures, and was unable to tolerate any kind of eye drops.

Plaintiff returned to see Dr. Berzins on April 3, 2003, for "Graves' disease and also ocular hypertension."  Dr. Berzins noted that, despite his orbital decompression, Plaintiff continued to have elevated pressures.  Plaintiff told Dr. Berzins that he had been qualified for the medical marijuana program.  Dr. Berzins said that he could not recommend use of marijuana on

a "scientific basis," but would test Plaintiff pre and post marijuana use the following week to determine if the drug reduced his pressures. Subsequent testing did not show that marijuana reduced the pressures.

In notes of a visit dated August 23, 2003, Dr. Berzins again indicated that Plaintiff's pressures were too high. He stated that Plaintiff needed to be on treatment with eye drops.

In a letter to Disability Determination Services (DDS) dated July 22 , 2004, Dr. Berzins stated that Plaintiff had a history of elevated intraoccular pressure, but that this had not resulted in glaucoma or other visual problems. He indicated that Plaintiff's vision was correctable to 20/20 in both eyes, and that Plaintiff had "no disability for any activity, as far as his vision or eyes are concerned."

Dr. Berzins again examined Plaintiff on September 30, 2004. He noted that Plaintiff had "some prominent eyes with some lid retraction," but that his "motility actually looks fairly normal with no diplopia in any position of gaze." Dr. Berzins indicated that Plaintiff's vision was "still correct to 20/20." He remarked that Plaintiff presented "somewhat of a therapeutic dilemma" because he continued to have elevated pressures, which it would have been better to lower, but that Plaintiff had not tolerated drops used for that purpose. He noted that Plaintiff continued to think that medical marijuana made his eyes more comfortable, and, though testing had not confirmed this,  continued to believe that it  lowered the pressures.

Plaintiff returned to see Dr. Berzins concerning problems with his glasses on October 18, 2004, December 29, 2004, and January 13, 2005. During the December 29, 2004 visit, he told Dr. Berzins that, though he thought that it lowered his pressures, he needed to stop using marijuana because he needed to do so "for his employment." Dr. Berzins reported that Plaintiff

FINDINGS AND RECOMMENDATION - 4

became agitated and abusive during the January 13, 2005 visit.  Based upon that conduct, he discontinued Plaintiff's treatment.

On June 8, 2005, Dr. Craig Greenburg, Plaintiff's treating physician, restarted a prescription of Tapazole and added prescriptions for Lescol XL and Valium to treat stress.  He noted that Plaintiff had Graves' disease and hyperlipidemia.  In response to a letter from DDS dated September 29, 2005, Dr. Greenburg reported that Plaintiff had Graves' opthalmopathy, which caused increased retroorbital pressure.  He opined that this had "rendered him disabled."

During a visit to Dr. Greenburg on March 28, 2006, Plaintiff complained of ringing in his ears and heat intolerance and reported that he had seen a podiatrist for foot pain.  Dr. Greenburg noted that mild proptosis persisted despite Plaintiff's eye surgery.  Plaintiff reported that he had separated from his wife, who had obtained a restraining order against him.  He also said that, though he had stopped using medical marijuana, he had not been allowed to return to work.

In notes of visits in December, 2006, and in June and December, 2007, Dr. Greenburg indicated that Plaintiff had mild proptosis which had not increased.  In response to a letter from DDS dated May 23, 2008, Dr. Greenburg stated that Plaintiff "has Grave's [sic] opthalmopathy – this caused increased retroorobital pressure, which has left him disabled."

Dr. Kurt Brewster examined Plaintiff at the request of DDS on November 22, 2005.  Plaintiff reported that he had been diagnosed with Graves' disease in 1998, and that he experienced ocular pain when he looked up or sideways, heard his eyes when they moved, and occasionally had diplopia (double vision).  Plaintiff reported that pain impeded his concentration.

Dr. Brewster noted that Plaintiff had a history of psychological issues, which he opined might be related to Plaintiff's ocular pain.  Plaintiff told him that he had hearing loss and fine and gross motor deficits.  Plaintiff estimated that he could stand for 1 hour and walk less than 30

FINDINGS AND RECOMMENDATION - 5

minutes in a day, partly because of fatigue caused by Graves' disease.  He reported that he

gardened 30 to 60 minutes per day and spent 3 hours a day on the computer.

Dr. Brewster noted opthalmoplegia (a paralysis of one or more extraocular muscles that

controls eye movements) and measured Plaintiff's vision at 20/50 bilaterally.  He noted that

Plaintiff could hear a normal conversation and follow multi-step directions.

Dr. Brewster diagnosed Graves' disease with opthalmoplegia, eye pain, and diplopia.  He

noted that common symptoms for Plaintiff's condition included eye tearing and irritation, and

opined that Plaintiff's reported symptoms of sleeplessness, anxiety, and "tolerance etc. . . . may

or may not be related to the Graves' disease."  Dr. Brewster opined that Plaintiff's primary

deficits were "some fatigue related to Graves' disease and persistent ocular pain."  He opined

that Plaintiff could lift/carry up to 20 pounds occasionally, could lift/carry 10 pounds frequently,

and could walk up to 6 hours with 15 minute breaks every 2 hours during an 8 hour work day.

Dr. Brewster  found no postural or manipulative limitations.

Plaintiff was treated a number of times at the Virginia Garcia Memorial Health Center.

In a visit there on December 9, 2005, Plaintiff reported increased anxiety, difficulty sleeping, and

palpitations.  His thyroid medication and Trazodone were adjusted.  He complained of sore,

puffy feet during a visit later that month, and on December 27, 2005, reported that he was still

not sleeping well.  Amitriptyline was prescribed to help Plaintiff sleep.  That prescription was

replaced by a prescription for Vistaril on January 5, 2006.  During a visit on January 12, 2006,

Plaintiff reported that the ringing in his ears had increased, and that his feet ached, burned, and

swelled.  He reported worsening problems with anxiety and nervousness during a visit on

January 26, 2006, and Celexa and Ambien were prescribed.  Plaintiff discontinued the Celexa

FINDINGS AND RECOMMENDATION - 6

after a few days because he thought it caused swelling. During a visit on March 7, 2006, Plaintiff reported mild depression and said that he was sleeping better.

On January 18, 2006, Plaintiff saw Dr. Jeffrey Russo for complaints of pain, swelling, and a burning sensation in his feet. Dr. Russo indicated that he was not sure of the cause of the burning sensation, but thought it might be a manifestation of the heat intolerance sometimes seen with Graves' disease. He prescribed Lyrica, which Plaintiff later said had helped.

Dr. David Pfendler, an Otolaryngologist, examined Plaintiff on January 23, 2006. Hearing deficits were noted in this examination, and in subsequent testing in April, 2006; March, 2007; and April, 2008.

At the request of the Oregon Department of Human Services, Gregory Cole, Ph.D., a psychologist, examined Plaintiff on March 30, 2006. Plaintiff reported that he had been "feeling down for years," and that his energy level and ability to concentrate had diminished. He also reported that he had problems with anger, experienced anxiety in new situations, and had persistent pain in his eyes and feet. He said that the pain increased his depression, and that depression increased his pain. Plaintiff was taking Tapazpole, Propranolol, Lyrica, and Lorazepam at that time. He had a medical marijuana card, and told Dr. Cole that he had used marijuana that day. He said that he could "only work a little" because he could not "quit the marijuana." Plaintiff said that he did the dishes daily, vacuumed and did laundry weekly, swept and mopped monthly, cooked twice a week, and shopped with a list three times a month. He told Dr. Cole that pain interfered with those chores, and that his wife managed the family's finances. Plaintiff reported that he enjoyed watching television, playing computer games, and taking care of the house and marijuana plants.

Dr. Cole administered the Beck Depression Inventory-II test.  Plaintiff's results indicated a severe level of self-reported depression symptomatology.  Dr. Cole reported that Plaintiff exhibited slow mental processing and that there was evidence of psychomotor slowing, but that Plaintiff could complete simple, multi-step tasks.  Plaintiff's immediate and delayed memory capabilities were rated as average.  Dr. Cole found that he exhibited below average intellectual capabilities, but no problems with attention and concentration.  He reported that Plaintiff's pace was slow and that he tended to give up easily, but that there was no evidence of poor effort or inconsistency.

Dr. Cole diagnosed major depression, recurrent; pain disorder associated with psychological factors and general medical condition; anxiety disorder; and a history of alcohol dependence.  He opined that Plaintiff might benefit from involvement in a chronic pain management treatment program.

Dr. Sean McMenomey evaluated Plaintiff for complaints of tinnitus on April 8, 2006.  He confirmed right-sided pulsate tinnitus.  Dr. McMenomey opined that, though this condition could be caused by Graves' disease, it would be expected to appear bilaterally if that were the case.

In a visit to Virginia Garcia Memorial Health Center on May 24, 2006, Plaintiff complained of poor motivation and trouble falling asleep and staying asleep.  Depression was noted, and a trial of Remeron was started to treat Plaintiff' sleep problems.  Notes of a visit on July 12, 2006 indicated that Plaintiff's depression had improved, but that his motivation continued to be low and that he continued to have difficulty sleeping.  Plaintiff again reported difficulty sleeping on November 3, 2006.  Dr. Brandi Mendonca indicated that Plaintiff had a history of glaucoma.  Plaintiff told her that marijuana was "the only thing that worked," and she completed a medical marijuana form that apparently indicated that Plaintiff used the drug to treat

glaucoma.

Plaintiff again reported sleep disruption and depression during a visit to Dr. Mendonca on November 16, 2006. Dr. Mendonca prescribed Requip for Plaintiff's restless leg syndrome, and increased the dosage during a visit on November 29, 2006. During a visit to Dr. Mendonca on December 18, 2006, Plaintiff reported that his restless leg symptoms had improved and that he was sleeping better, but that his irritability had increased and that he angered easily. Dr. Mendonca prescribed Zoloft.

On February 8, 2007, Plaintiff completed a form on which he reported that he had little interest in doing things, experienced little pleasure, had problems with appetite, felt tired, had difficulty concentrating, and felt like a failure for having let himself and his family down. Dr. Mendonca discontinued Plaintiff's use of Zoloft and prescribed Wellbutrin in its place. During a visit on March 5, 2007, Plaintiff reported a worsening of tinnitus and no improvement in mood. Dr. Mendonca increased his Wellbutrin dosage.

During a visit on April 25, 2007, Plaintiff reported that his symptoms of depression had improved but that his depression continued to be very difficult.

Dr. Mendonca renewed Plaintiff's prescriptions for Requip and Lyrica on September 7, 2007. Plaintiff reported that he had discontinued use of Wellbutrin on his own because he had not seen that it made any difference.

On February 5, 2005, Plaintiff reported that he was doing well, and only needed his medical marijuana form signed. Dr. Reynolds, another doctor at the Virginia Garcia Memorial Health Center, signed a medical marijuana form indicating that the drug was being used to treat glaucoma.

Dr. Mendonca completed a detailed functional capacities assessment of Plaintiff dated

November 20, 2008.  Dr. Mendonca opined that Plaintiff had substantial losses in his ability to remember work like procedures; understand and remember very short, simple instructions; maintain attention for extended periods of two-hour segments; maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being unduly distracted; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; complete a normal work day and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; make simple work-related decisions; and be aware of normal hazards and take appropriate precautions.  She opined that these limitations restricted Plaintiff to work in a sheltered work environment and precluded competitive employment.  She also opined that Plaintiff's impairments would cause him to be absent from work 4 or 5 days per month.

Dr. Mendonca indicated that Plaintiff had chronic pain in his eyes and feet, vision deficits, and problems with sleep and fatigue, and opined that Plaintiff's mental and emotional conditions exacerbated his physical symptoms and functional limitations.  She opined that Plaintiff could stand or walk 4 hours per day, could sit for 4 hours per day, would need to be able to shift positions from sitting to standing or walking at will, and would need to take unscheduled 10 minute breaks every 2 hours.  Dr. Mendonca thought that Plaintiff could lift up to 10 pounds frequently and could lift 50 pounds occasionally, and that he could not climb steps, climb ladders or stoop.  She opined that he had marked difficulties maintaining social functioning and marked difficulties maintaining concentration, persistence, or pace.  Dr. Mendonca indicated that Plaintiff either had no or only mild restrictions in his activities of daily living, and reported that

FINDINGS AND RECOMMENDATION - 10

Plaintiff had not had any periods of decompensation lasting more than 2 weeks during the previous year.

Dr. Mendonca recommended that a "formal physical capacities evaluation be performed."

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or

equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**<u>Testimony</u>**

**<u>Plaintiff</u>**

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff's work attendance was not good following his diagnosis with Graves' disease in the late 1990s.  The disease caused severe eye pain and made his eyes swell to the point that he could not fully close them.  In October, 2002, he had surgery to make more space in his eye orbits.  He has not worked since that time.

Even after the surgery, Plaintiff's eyes are still swollen and painful, and Plaintiff' cannot fully close them.  Reading is especially painful.  Looking straight ahead at a television causes eye muscle fatigue, and Plaintiff has double vision when he looks down or tries to drive at night. Bright lights bother him.  Eye pain, back pain, and foot pain make it difficult to sleep.  Plaintiff is depressed, does not want to be around other people, and sometimes angers easily.  He has trouble concentrating and staying on a schedule.  His right ear rings constantly, and his eye movements are so loud that they interfere with his ability to hear voices.

Plaintiff takes Propranodol for his thyroid, Lyrica for foot pain, Requip for restless leg, and marijuana for eye pain, pressure in his eyes, and muscle spasms.  Propranodol causes problems with confusion.

Plaintiff can sit, stand, or walk for about 30 minutes at a time.  He can lift 40-50 pounds five or six times during a workday**,** and can possibly lift half that amount regularly throughout a workday, but is not sure and "would have to actually try the weights and see."  He is easily distracted, and his wife, who takes care of the couple's finances, reminds him and makes lists for him.  Plaintiff is able to help with cooking and does dishes occasionally.  He is able to shop for

groceries.  He can mow the lawn for 30 minutes, and then needs to rest before going on.  If he works for half a day, he's "basically done for the rest of the day."

Plaintiff also described his functional limitations in a report dated October 3, 2005. There, Plaintiff reported that he watched television, fixed lunch, watered plants, and fed and watered his cat and bird.  He cleaned house for an hour, did laundry for 2 hours, mowed the yard, and helped cook.  He shopped twice a month for 2 hours.  His temper kept him away from people and he did not take part in social activities.  Pain prevented him from concentrating or completing tasks, and he took naps because his medications made him tired.

**Delories Dietzel**

At the hearing, Delories Dietzel, Plaintiff's wife, testified that Plaintiff's eyes remained open about a quarter of an inch, even when Plaintiff was sleeping.  Plaintiff complained of eye pain, became agitated and impatient easily, and had restless legs.  He had trouble focusing on what he was supposed to be doing, and often forgot things.  Plaintiff complained of ringing in his ears and said he could not hear her.  He was hyperactive and argued.

Ms. Dietzel also submitted a report dated October 9, 2005 addressing  Plaintiff's functioning.  There, she stated that Plaintiff had trouble "doing a lot of things because of his eyes."  Plaintiff became agitated easily, was argumentative, and became violent at times and his emotions were unstable when "his Graves is not doing good."  Ms. Dietzel stated that Plaintiff stayed to himself more, often became distracted, and slept poorly.  His feet hurt, and he could walk only 2 blocks at a time.  He was "not very good" at following written or spoken instructions, and could not pay attention for more than 10 minutes.  Ms. Dietzel reported that Plaintiff mowed the lawn every other week and did some laundry weekly, and that he needed to

be reminded to do these tasks.  He helped her prepare simple meals, and was able to make
sandwiches for himself.  After lunch, he napped until about 4:00 p.m.

**Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual with Plaintiff's age,
education, and past relevant work, who could lift 50 pounds occasionally and 25 pounds
frequently; could sit, stand, and walk (each) for 6 hours in an 8 hour work day; was limited to 1
to 3 step tasks; could not be exposed to hazards or loud noises; could not operate a motor
vehicle; and was limited to superficial contact with coworkers and the public.[1]  The VE testified
that the described individual could work as a salvage worker, a warehouse worker, or a hand
packager.

In response to questioning by Plaintiff's counsel, the VE testified that employers would
not tolerate unscheduled breaks and that one or two absences per month would not be tolerated
indefinitely.

**ALJ's Decision**

At the first step of her analysis, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since the alleged onset of his disability in 2002.

At the second step, the ALJ found that Plaintiff had the following severe impairments:
Graves' disease with opthalmopathy, marijuana dependence, major depression, anxiety disorder,
pain disorder, and tinnitus.  She identified hyperthyroidism, restless leg syndrome, bilateral
elbow tendinitis, back pain, and glaucoma as non-severe impairments.

---

[1]The ALJ took administrative notice that these limitations precluded performance of Plaintiff's
past relevant work.

At the third step of her analysis, the ALJ found that, alone or in combination, Plaintiff's impairments did not meet or equal a presumptively disabling impairment set out in the "listings," 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to the fourth step, the ALJ evaluated Plaintiff's residual functional capacity (RFC). She found that Plaintiff retained the functional capacity required to perform medium exertional level work except to the extent that he was limited to "superficial coworker and public contact and 1 to 3 step tasks," and "is to have no exposure to hazards including operation of motor vehicles and is to avoid even moderate exposure to loud noise." The ALJ found that Plaintiff's description of the severity of his symptoms was not credible to the extent it was inconsistent with this determination.

At the fourth step, the ALJ found that Plaintiff could not perform his past relevant work.

At the fifth step of her analysis, based upon the hearing testimony of the VE, the ALJ found that Plaintiff was not disabled within the meaning of the Act because he could perform other work that existed in substantial numbers in the national economy. The ALJ cited salvage laborer, a warehouse worker, and a hand packager positions as examples of such work.


**<u>Standard of Review</u>**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert.</u> <u>denied</u>, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.

42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in finding that marijuana dependence was one of his

severe impairments, in failing to find that his mental impairments equaled the severity criteria

for a mental listing, in failing to credit the functional limitations found by Dr. Mendonca, in

failing to properly credit the observations of his wife, in assessing his lifting capabilities, in

finding that he was not wholly credible, in evaluating his residual functional capacity, and in

finding that he could perform "other work" at step five of the disability analysis.

## 1. Marijuana Dependence as "Severe" Impairment

Plaintiff contends that, because she is not an "acceptable medical source," the ALJ was

not qualified to determine that his marijuana use constituted a "severe" impairment.  Plaintiff

notes that "acceptable medical sources" qualified to diagnose "medically determinable impairments" include licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists.  See 20 C.F.R. § 404.1513(a); SSR 06-3p.  He argues that, though the record establishes that he has a medical marijuana card and does use marijuana, use alone "establishes neither dependence nor impairment."

Plaintiff's argument is well taken: though Dr. Berzins questioned Plaintiff's use of marijuana and found, upon testing, that it did not reduce Plaintiff's intraocular pressures, the record does not show that he or any other doctor diagnosed marijuana dependence.  However, any error here was harmless: Analysis of drug or alcohol dependence is relevant when the ALJ finds a claimant disabled at Step 3 or Step 5 and the record includes evidence of drug or alcohol addiction.  Then, the ALJ must determine whether the claimant's addiction is a contributing factor that is "material" to the finding of disability.  20 C.F.R. § 416.935; Para v. Astrue, 481 F.3d 742, 746-47 (9th Cir. 2007).  Here, the ALJ did not find that Plaintiff was disabled, and accordingly did not need to further analyze any issue concerning Plaintiff's use of marijuana.[2]

2. **ALJ's Step 3 Analysis**

At the third step of her disability analysis, the ALJ stated that no treating or examining physician had made findings "equivalent in severity to the criteria of any listed impairment." Plaintiff contends that this is incorrect, because Dr. Mendonca had indicated that he had marked

_____

[2]A medical impairment that "significantly limits" a claimant's "ability to do basic work activities" is "severe" within the meaning of relevant regulations.  20 C.F.R.  §§ 404.1520(c); 416.920(c). The ALJ may have committed harmless error in determining that Plaintiff's drug use was a "medically determinable" impairment.  However, in concluding both that Plaintiff was dependent on the drug and that it significantly interfered with his ability to work, she merely credited Plaintiff's own analysis: As noted above, Plaintiff told an examining psychologist that he could "only work a little" because he could not quit the drug.

difficulties in maintaining social functioning and marked difficulties in maintaining

concentration, persistence, or pace.  He contends that this finding, and the diagnoses of his

depression, anxiety, and pain disorder establish that his mental impairments meet or equal

presumptively disabling impairments set out in the "listings,"  20 C.F.R. Part 404, Subpart P,

Appendix 1.

The ALJ did err in stating that no physician had made findings that were equivalent in

severity to a listed impairment: If credited, Dr. Mendonca's description of the functional

limitations resulting from Plaintiff's mental impairments would have been sufficient to satisfy

the "B" criteria.  However, as discussed below, the ALJ rejected Dr. Mendonca's conclusions as

to Plaintiff's limitations, and provided legally sufficient reasons for doing so.  In her step three

analysis, the ALJ set out her reasons for concluding that the "B" criteria were not met.  Those

reasons are supported by substantial evidence in the record.  Though she did not specifically

address Dr. Mendonca's conclusions in that portion of her decision, she fully analyzed Dr.

Mendonca's evaluation elsewhere in her decision, and her reasons for rejecting Dr. Mendonca's

conclusions apply to the step three analysis.


3.  **ALJ's Analysis of Dr. Mendonca's Opinion**

As noted above, Dr. Mendonca, one of Plaintiff's treating physicians, opined that

Plaintiff had significant functional limitations.  She concluded that Plaintiff could stand or walk

4 hours per day, could sit for 4 hours per day, would need to be able to shift positions from

sitting to standing or walking at will, and would need to take unscheduled 10 minute breaks

every 2 hours, could lift up to 10 pounds frequently and could lift 50 pounds occasionally, could

not climb steps or ladders or stoop, and would miss 4 or 5 days of work per month because of his impairments.

Notwithstanding her assertion that Dr. Mendonca's assessment was largely consistent "with a medium exertion physical RFC," in concluding that Plaintiff could perform medium exertional level work and was not disabled, the ALJ rejected Dr. Mendonca's evaluation.  The question here is whether she provided the required support for that rejection.

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An ALJ must provide "specific and legitimate" reasons, which are supported by substantial evidence in the record, for rejecting the opinion of a treating physician that is contradicted by the opinion of another physician.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  An ALJ may reject the opinion of a doctor that is not supported by the record as a whole, including clinical findings and treatment notes.  See, e.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  An ALJ may also reject a doctor's opinion that is based upon a claimant's subjective complaints that are properly discredited.  Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004).

The ALJ rejected Dr. Mendonca's assessment of Plaintiff's physical and mental limitations on the grounds that there was "no correlation between treatment records of objective findings and the limitations imposed" in her evaluation.  She observed that the mental health limitations in Dr. Mendonca's assessment "were completely unsupported by any findings in Dr. Mendonca's treatment records," and consequently gave them "no weight."  The ALJ also noted

that there was no evidence that Dr. Mendonca had reviewed all the medical evidence in the record before the Agency.

Dr. Mendonca's assessment of Plaintiff's physical limitations was inconsistent with the opinion of Dr. Brewster, an examining doctor, and her assessment of Plaintiff's mental impairments was inconsistent with the assessment of Dr. Cole, an examining psychologist.  The ALJ discussed the assessments of these doctors at length in the part of her opinion in which she addressed Dr. Mendonca's opinions: Her evaluation of Dr. Mendonca's conclusions must be viewed in the context of that discussion, and in the context of Dr. Mendonca's own assertion that a "formal physical capacities evaluation be performed."  The ALJ noted the objective testing that the examiners had performed.  She noted that Dr. Cole had assigned a GAF score that indicated only moderate symptoms or difficulty in social functioning, and that Dr. Brewster had found relatively mild physical limitations, including no postural limitations whatsoever.

The ALJ here provided the required support for her rejection of Dr. Mendonca's opinions.  Her reasons for rejecting Dr. Mendonca's opinions were specific and legitimate.  They were also supported by substantial evidence in the medical record.


4. **ALJ's Assessment of Lay Witness Evidence**

As noted above, Delories Dietzel, Plaintiff's wife, testified that Plaintiff's eyes remained open about a quarter of an inch, even when Plaintiff was sleeping; that Plaintiff complained of eye pain, became agitated and impatient easily; had restless legs; had trouble staying on task; complained of ringing in his ears; and was hyperactive, argumentative, and became violent and emotionally unstable when "his Graves is not doing good."  In a form submitted to DDS, Ms. Dietzel stated that Plaintiff stayed to himself more, often became distracted, slept poorly, could

only walk 2 blocks at a time, was "not very good" at following written or spoken instructions, and could not pay attention for more than 10 minutes.

The ALJ accepted these statements as "descriptive" of Ms. Dietzel's perceptions, but concluded that they did not provide a sufficient basis for altering her assessment of Plaintiff's RFC.  She added that Ms. Dietzel's description was "not fully consistent with the medical and other evidence of record."

Plaintiff correctly notes that an ALJ cannot reject lay witness statements without offering reasons that are "germane" for doing so.  E.g., Dodrill v. Shalala, 12 F.3d 915, 1919) (9th Cir. 1993).  Plaintiff argues that the ALJ's "reason for rejecting Mrs. Dietzel was improper and inadequate," because lay witness evidence would never add anything to a case if it were only credited if it were fully consistent with other evidence in the record.

I disagree.  The ALJ here did not find that Ms. Dietzel was not wholly credible or otherwise  "reject" her testimony.  She accepted that Ms. Dietzel accurately reported her observations, and simply concluded that these honestly reported observations did not establish that Plaintiff was disabled.  I am satisfied that accepting that a lay witness has truthfully reported observations of a claimant does not require an ALJ to conclude that a claimant is disabled if the observations are inconsistent with other objective evidence in the record, or if the impairments reported do not render the claimant disabled within the meaning of the Act.[3]  An ALJ may discount lay testimony that is not consistent with a claimant's activities or with objective evidence in the record.  Lewis v. Apfel, 427 F.3d 1211, 1218 (9th Cir. 2005).  Here, the ALJ's observation that Ms. Dietzel's report was inconsistent with "other evidence in the record" was

---

[3]A contrary conclusion would elevate lay witness testimony above even the opinions of treating physicians, which, as noted above, can be rejected if they are inconsistent with other opinions and evidence in the record.

FINDINGS AND RECOMMENDATION - 22

accurate, germane, and legally sufficient to support the weight given to Ms. Dietzel's evidence.

5. **ALJ's Findings Concerning Plaintiff's Ability to Lift**

In order to perform medium level work, an individual must be able to lift up to 50 pounds, and be able to frequently lift or carry up to 25 pounds. The ALJ found that Plaintiff could lift up to 50 pounds occasionally and 25 pounds regularly based upon his testimony that he could lift 50 pounds a few times, and could regularly lift "possibly half that" throughout the work day.

In addition to Plaintiff's testimony, the medical record includes a variety of opinions as to Plaintiff's ability to lift and carry. Dr. Mendonca opined that Plaintiff could lift 50 pounds occasionally and 10 pounds frequently. Dr. Brewster opined that Plaintiff could lift a maximum of 20 pounds and could lift 10 pounds frequently–a conclusion that the ALJ rejected as "more restrictive than Mr. Dietzel's own estimated capabilities." Dr. J. Scott Pritchard, a non-examining consulting physician, concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently.

Plaintiff contends that the ALJ misinterpreted his testimony, and argues that her conclusion as to his lifting ability is not supported by the record. I disagree. As the fact-finder in disability proceedings, the ALJ is responsible for resolving conflicts and ambiguities in the medical evidence. E.g., Thomas v. Barnhart, 278 F.3d 947, 952 (9th Cir. 2002); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). The medical record concerning Plaintiff's ability to lift and carry was inconsistent, and the ALJ resolved the inconsistency in a reasonable manner. As noted above, the ALJ fully supported her rejection of Dr. Mendonca's assessment of Plaintiff's capabilities, and Dr. Mendonca herself indicated uncertainty as to her own

assessment by recommending that a "formal physical capacities evaluation be performed." The ALJ's interpretation of Plaintiff's testimony was not the only possible interpretation, but it was reasonable, and her conclusion as to Plaintiff's ability to lift and carry was supported by substantial evidence in the record.

6. **Assessment of Plaintiff's Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is not supported by objective medical evidence. Reddick, 157 F.3d at 722 (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(*en banc)).* If a claimant produces the requisite medical evidence and there is no evidence of malingering, an ALJ must provide specific, clear and convincing reasons, supported by substantial evidence, to support a determination that the claimant was not wholly credible. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p. If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

An ALJ must examine the entire record and consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7. An ALJ may support a determination that the claimant was not

FINDINGS AND RECOMMENDATION - 24

entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living. <u>Thomas</u>, 278 F.3d at 958-59 (9th Cir. 2002).

The record here included evidence of impairments that could reasonably be expected to produce pain and other symptoms, and there was no evidence of malingering. Therefore, the ALJ was required to provide clear and convincing reasons, supported by substantial evidence, for concluding that Plaintiff was not wholly credible.

Plaintiff contends that the ALJ did not adequately support her credibility determination. I disagree. In evaluating Plaintiff's credibility, the ALJ cited activities of daily living that were inconsistent with Plaintiff's testimony concerning the severity of his symptoms and impairments. She noted that Plaintiff had given conflicting statements about his sleep patterns, and had insisted on continued use of marijuana to reduce ocular pressures after objective testing had shown that it was not effective, and despite his acknowledgment that it substantially interfered with his ability to work. The ALJ noted that Plaintiff had given inconsistent statements as to whether he had been treated for substance abuse, and noted that he did not seek counseling for his allegedly disabling anxiety and depression. These reasons for discounting Plaintiff's credibility are clear and convincing, and they are supported by substantial evidence in the record.

7. **<u>ALJ's Step Five Analysis</u>**

Based upon the VE's responses to his vocational hypothetical, at step five of her disability analysis, the ALJ concluded that Plaintiff could perform jobs that existed in substantial numbers in the national economy. Plaintiff contends that the ALJ erred in reaching this conclusion because the hypothetical upon which the VE's testimony was based did not include all of his limitations.

FINDINGS AND RECOMMENDATION - 25

I disagree. Certainly, to be accurate, an ALJ's hypothetical must set out all of a claimant's impairments and limitations, and a VE's opinion that a claimant can work has no evidentiary value if the assumptions in the hypothetical are not supported by the record. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). However, for the reasons set out above, I conclude that the ALJ's RFC assessment accurately reflected the limitations supported by the record and was legally sufficient. Accordingly, the VE's testimony that Plaintiff could perform specified jobs had evidentiary value and could be relied upon in reaching the conclusion that Plaintiff is was not disabled within the meaning of the Act.

8. **Disability at Steps Three and Five**

In the concluding section of his memoranda, Plaintiff reiterates his assertions that he should be found disabled at step three because Dr. Mendonca's assessment establishes that his mental impairments are severe enough to demonstrate disability under the "listings." He also argues that he should also be found disabled at step five because the limitations she found would preclude competitive employment. These arguments fail because the ALJ adequately supported both her rejection of Dr. Mendonca's opinions and her own conclusion that Plaintiff's impairments were not disabling.

## Conclusion

A Judgment should be entered AFFIRMING the decision of the Commissioner and DISMISSING this action with prejudice.

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due July 9, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 21st day of June, 2012.


　/s/ John Jelderks　　　　　　　　　　
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 27